**Dustin Eugene SMITH, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 94–245.

Supreme Court of Wyoming.

Aug. 31, 1995.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender; Deborah Cornia, Appellate Counsel, for appellant.

Joseph B. Meyer, Attorney General; Larry Donovan, Senior Assistant Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Assistant Attorney General; Prosecution Assistance Program, Theodore E. Lauer, Director, and Jessica Loeper and Bryan D. Sidwell, Student Interns, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

THOMAS, Justice.

In this case, we must decide whether the provisions of Wyo.Stat. § 6–5–305(a) (1988) apply to a situation in which an assault and battery was committed upon a witness after the trial had concluded, and he had been released from his subpoena. Dustin Eugene Smith (Smith) was convicted after a jury trial of conspiracy to intimidate a witness in violation of Wyo.Stat. § 6–1–303(a) (1988) and Wyo.Stat. § 6–5–305(a). Collateral issues are presented relating to the admissibility of testimony reporting the statements of a co-conspirator and the requirement by the trial court that Smith deposit periodic payments to defray the costs and expenses of this appeal. We hold the statute does apply in an instance in which the proceedings have not become final after appeal, and the trial judge did not abuse his discretion when he over-ruled Smith's hearsay objection and properly admitted the testimony concerning statements by a co-conspirator under Wyo.R.Evid. 801(d)(2)(E). The Judgment and Sentence is affirmed. The trial court did err, however, when it required the defendant, proceeding on appeal *in forma pauperis,* to pay for prospective costs and expenses of the appeal in advance. We reverse and remand the trial court's Conditional Order Permitting Leave to Proceed *in Forma Pauperis* and Order Continuing Appointment of Counsel and Requiring Periodic Payments.

Smith sets forth these issues in the Brief of the Appellant:

I. Was the evidence presented in this case legally and factually insufficient to establish that the Appellant committed the crime of conspiracy to intimidate a witness in the discharge of his duty?

II. Did the trial court commit reversible error when it improperly instructed the jury regarding the law applicable to the case in violation of Appellant's constitutional right to due process?

III. Did the trial court err when it admitted hearsay statements of the co-conspirator in violation of W.R.E. 801(d)(2)(E)?

IV. Did the trial court err when it required the Appellant to make monthly payments to proceed on appeal?

The issues set forth by the State of Wyoming in the Brief of the Appellee are:

I. Was there sufficient evidence to permit the jury to find that Appellant conspired with one or more persons to commit the crime of intimidation of a witness?

II. Did the District Court properly instruct the jury on the applicable law in Instructions No. 4 and No. 11?

III. Did the District Court err in admitting the statements of the co-conspirator?

IV. Did the District Court erroneously require Appellant to make monthly payments to proceed on appeal?

Smith was charged with conspiracy to intimidate a witness, in violation of Wyo.Stat. § 6–5–305(a) and Wyo.Stat. § 6–1–303(a), for his role in an assault and battery on Paul Minick (Minick), who testified at the trial of Smith's sister, Rachel Smith. In December of 1992, Minick and his friend, Mike Webb, were driving north on I–90 about 20 miles south of Sheridan when they apparently suffered a tire blowout. In fact, Rachel Smith shot the right rear tire with a rifle, and she and Tammy Higgins then robbed the two teenage boys at gunpoint. *See Higgins v. State,* 889 P.2d 964 (Wyo.1995), and *Smith v. State,* 880 P.2d 573 (Wyo.1994). Pursuant to a subpoena issued by the district court, Minick returned to Sheridan on July 29, 1993 and testified against Rachel Smith on July 30, 1993. He was released from the subpoena

on that day, but he stayed until the jury returned a verdict of guilty at about 4:45 p.m. After the verdict was returned, Minick spent some time at the home of a deputy sheriff and, later, two deputies from the sheriff's office took Minick to dinner and then, about 8:15 p.m., to the bus depot in Sheridan to return to his home in Montana.

While Minick was at the bus depot, he was approached by David Rhoden (Rhoden), who requested assistance in jump starting his van. Minick declined at first, but then agreed to assist Rhoden. The two went into the parking lot at the bus depot and were approaching a van when Rhoden stopped to tie his shoe. When Minick turned around, Rhoden hit him in the face inflicting a bloody nose and a lip laceration that left a scar.

The conspiracy statute, WYO.STAT. § 6–1–303, provides, in pertinent part:

> (a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement.

The crime Smith was charged with conspiring to commit, is defined in WYO.STAT. § 6–5–305(a), which provides:

> A person commits a felony punishable by imprisonment for not more than ten (10) years, a fine of not more than five thousand dollars ($5,000.00), or both, if, by force or threats, he attempts to influence, intimidate or impede a juror, witness or officer in the discharge of his duty.

Smith was tried on May 3, 1994, and Minick testified about his role as a witness in the Rachel Smith trial and about the assault and battery at the bus depot. MAG, a witness to the conspiracy, testified to the occurrence of the events on the night of July 30, 1993, including statements made by Rhoden. Following the return of the verdict in Rachel Smith's trial, MAG and Rhoden went to a bar near Rhoden's apartment to drink. Smith, Smith's mother, and another woman arrived in a car about a half hour to an hour later. Smith got out of a car where he had been sitting with the two women and approached MAG and Rhoden. The three of them had been working together for approximately two months at Carl Weissman & Sons (a supply firm for contractors), and they were friends at that time.

In an inexplicable excursion into fantasy, Smith told the other two, specifically addressing MAG, "that there was a guy that had lied in court and got the sister into trouble and convicted her, whatever, and that he wanted me to beat her up." MAG quickly corrected the reference to "her" by stating "him" in his testimony. Smith offered MAG fifteen dollars and all the beer he could drink if he would beat Minick. MAG declined the offer stating that he did not want to go to jail. Smith then asked Rhoden if he would beat Minick. Rhoden did not respond, and the five people then went to a different bar to drink and to discuss beating Minick. MAG stated, at some point, Smith's mother said, "the person that testified against the defendant's sister would be at the bus depot that night."

Around 8:00 or 8:30 p.m., Smith announced "they [Smith and Rhoden] were going to go up [to the bus station] and look things over and see if the guy was there, and he was going to point the guy out for Dave [Rhoden] and just kind of case it out and see if there was any cops there." The two left the bar and returned approximately forty-five minutes later. During that period, Rhoden lured Minick outside the bus depot and struck him in the face. When they returned to the bar, Smith and Rhoden "were all revved up and pumped up that they just did the job." When asked what that connoted, MAG explained, "They were happy. Before they parked the car then, they came down Main and were going to turn left into the bar, and they were yelling out the window and stuff, kind of yahoo and all that."

At the trial, the prosecutor and MAG then engaged in the following dialogue, punctuated by an objection:

Q: Okay. When they came back, did the defendant and Mr. Rhoden tell you what had happened?

A: Yes, Dave—Dave did.

Q: Okay.

[Defense Counsel]: I have to object to hearsay on Mr. Rhoden's statement.

The Court: Overruled.

Q: (By [Prosecutor]) What—okay. What was explained to you when they got back? Who was doing the talking?

A: Dave was.

Q: And what happened?

A: Dave said that he kicked the guys [sic] butt. I mean, they were just revved up when they first got back. And I said, you know, what happened? We all asked what happened.

And Dave said that Dusty had pointed him out for him and whatnot, and then he parked the car a block away or so he wouldn't be seen. And then Dave went in and told the guy—the witness that he had car problems and asked him if he would come out and hold the battery cable so he could get his car started. And I guess he said it took him awhile to get the kid convinced he needed help with it, and then the kid finally went outside, and then that's when Dave hit him and then took off from there and then they came back.

A: Okay. So—so the defendant—you said he pointed out Mr. Minick in the bus station?

A: Right.

Q: And he went back to the car and Mr. Rhoden carried out the plan?

A: Right.

Q: What was the defendant doing during the time that Mr. Rhoden was—

A: I guess just waiting for Dave to show back up.

Q: Okay. Now, once—when you got back to the bar and David Rhoden explained what was happening, what was the defendant doing then? Did he ever—

A: He was happy and revved up about it and just kind of, you know, going along with David's story.

Q: Did he ever interject anything into the story or—

A: Not really. He just was—he seemed real happy.

Q: Okay. Now, once you were told this happened, did you witness the payoff?

A: Yes, I did.

Q: Who paid?

A: Dusty paid, and his mom and this girl that was there with them, they all whipped it out of their pockets, or purses, or whatever.

Q: So they didn't, like, take it out of a bunch of money on the table, they actually—

A: No, no, they all pulled it out of their pockets.

Q: Did the defendant do that too?

A: Yes, he did.

Q: Took it out of his wallet?

A: Yes.

Q: Did you see actually how much was paid?

A: No, I didn't. I just saw them all throwing the money on the table to Dave.

Q: Okay. Was there anything else that was offered in the form of a payoff?

A: Just the free beer.

Smith was found guilty by the jury. In the Judgment and Sentence, Smith was sentenced to a term of not less than twenty-four, nor more than forty-eight, months. Pursuant to the split sentencing provisions of WYO. STAT. § 7–13–107 (1987), all but sixty days of that sentence were suspended, with provision that the sixty days be served in the Sheridan County Jail. Smith then was placed on probation for four years. He was assessed a fine of $1,000; attorney fees in the amount of $1,300 (with the provision that one-half of that amount could be worked off as Community Service under the supervision of the Sheridan County Sheriff's Office); and a surcharge for the Victim's Compensation Fund in the amount of $200. On August 19, 1994, Smith filed a Notice of Appeal and a Motion for Leave to Proceed on Appeal *in Forma Pauperis*. The trial court held a hearing on the motion and granted the request to proceed *in forma pauperis* on condition that he pay $100 each month toward the reimbursement for costs and fees and attorney fees on appeal. The transcript indicates an intention

that the payments should continue until such time as Smith's account reached $2,500. Smith appeals from the Judgment and Sentence and the Conditional Order Permitting Leave to Proceed *in Forma Pauperis* and Order Continuing Appointment of Counsel and Requiring Periodic Payments.

■ Smith's first issues focus upon the status of Minick as a witness at the time he was assaulted by Rhoden. The first claim of error asserts insufficient evidence to qualify Minick as a witness under Wyo.Stat. § 6–5–305(a). The second error asserted is the failure of the trial court to include the phrase "in the discharge of his duty" in defining the elements of the substantive crime and the giving of an instruction advising the jury Minick was a witness as a matter of law. The crux of Smith's contention with respect to the first two issues is that Minick had completed his testimony and had been released from his subpoena at the time of the assault. Smith asserts, at that time, Minick was not a "witness in the discharge of his duty."

In *Fisher v. McDaniel*, 9 Wyo. 457, 64 P. 1056 (1901), this court noted the similarity of our statute to the statute in Ohio. In *State v. Crider*, 21 Ohio App.3d 268, 487 N.E.2d 911, 912 (1984), the court said:

One count of aggravated burglary was based upon the underlying felony of intimidation of a witness, namely, the victim. R.C. 2921.03. Crider argues that at the time of the intimidation there were no criminal proceedings pending and thus the victim was not a "witness." The state argues that the victim, who was the object of Crider's original criminal conduct, was intimidated by him when he returned to the victim's home. At that time, the victim was a witness within the purview of R.C. 2921.03. This court agrees.

R.C. 2921.03(A) provides:

"No person, knowingly and by force or by unlawful threat of harm, shall attempt to influence, intimidate, or hinder a * * * witness in the discharge of his duty."

\* \* \* \* \* \*

In a 1961 bribery case, *State v. Lieberman* (1961), 114 Ohio App. 339, 179 N.E.2d 108 [18 O.O.2d 25], the appellate court approved a jury instruction which defined the word "witness." The trial court defined a "witness" as a person who "did in fact have factual knowledge which was pertinent or relevant to * * * proceedings, and * * * if * * * [the person] had such knowledge, * * * [the person] was a 'witness,'" even though not subpoenaed to testify. *Id.* at 342, 179 N.E.2d 108. The Supreme Court refused to accept the matter for consideration. *State v. Lieberman* (1961), 172 Ohio St. 478, 178 N.E.2d 506 [17 O.O.2d 464].

The *Lieberman* definition was generally followed by this court in an intimidation case, *State v. Hudson* (June 30, 1982), Summit App. No. 10491, unreported [1982 WL 5074]. In *Hudson* a witness was defined as "a person with factual knowledge relevant to the issues involved in the proceedings." An examination of the intimidation statute does not offer an express definition of the word "witness." However, rules of statutory construction provide that a word is to be read in context and construed according to its common usage. R.C. 1.42. Webster's Third New International Dictionary, Unabridged (1961), provides the following definition of the word "witness":

" * * * one that is cognizant of something by direct experience: one who beholds or otherwise has personal knowledge of something * * * see earwitness, eyewitness * * *."

The intimidation statute was designed to protect those people who saw, heard or otherwise knew, or were supposed to know, material facts about the criminal proceeding. Once a person becomes possessed of such material facts, he likewise becomes a "witness" within the meaning of R.C. 2921.03, and subject to its protection.

It would be ludicrous to hold that the victim, who was intimidated, is not a "witness" under R.C. 2921.03(A) because the victim had not yet had the opportunity to identify the offender, the prosecution had not yet issued a complaint against him, or the police had not yet apprehended him to commence proceedings. The accused, if

guilty, generally knows the witnesses who can testify against him before as well as after they are known to the police and the prosecuting attorney. Therefore, the victim became a "witness" at the time of the original victimization and within the ambit of protection offered by R.C. 2921.03(A).

In Wyoming, WYO.STAT. § 8–1–103 (1989) provides, in part:

(a) The construction of all statutes of this state shall be by the following rules, unless that construction is plainly contrary to the intent of the legislature:

(i) Words and phrases shall be taken in their ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import * * *.

A witness is defined in BLACK'S LAW DICTIONARY 1603 (6th ed.1990):

Witness, *n.* In general, one who, being present, personally sees or perceives a thing; a beholder, spectator, or eyewitness. One who is called to testify before a court. *People v. Ruiz,* 100 Misc.2d 562, 419 N.Y.S.2d 864, 866 [1979]. One who testifies to what he has seen, heard, or otherwise observed. *Wigginton v. Order of United Commercial Travelers of America,* C.C.A.Ind., 126 F.2d 659, 666 [7th Cir.1942].

■ In this case, the trial court gave the following instruction defining the term "witness":

### INSTRUCTION NO. 11

A "witness" is defined as one who, being present personally sees or perceives a thing, a beholder, spectator, or eyewitness; one who testifies to what he has seen, heard, or otherwise observed. I have determined, as a matter of law, that Paul Minnick [sic] was a witness within the meaning of the statute. However, it is a question of fact for you to decide whether the defendant knew that Paul Minnick [sic] was a wtiness [sic] and if, knowing that Minnick [sic] was a witness, whether the other elements of the crime have been proved beyond a reasonable doubt.

In light of the definitions of "witness" we have quoted, there is no error in the definition set forth in Instruction No. 11 and, given the status of Minick as the victim who testified at the trial of one of his robbers, he was a "witness" as a matter of law.

■ Smith argues the modifying phrase "in the discharge of his duty" was omitted in Instruction No. 11 and also in Instruction No. 4 setting forth the elements of this crime. The elements instruction reads:

### INSTRUCTION NO. 4

The defendant is charged with conspiracy to intimidate a witness. He has plead not guilty. The necessary elements of the crime of Criminal Conspiracy are:

1. The crime occurred within the County of Sheridan on or about the date of July 30, 1993; and,

2. The defendant conspired with one or more persons to commit the crime of Intimidation of a Witness, a felony under the laws of the State of Wyoming.

3. The defendant or one of the persons with whom he conspired did any act to effect the object of the conspiracy.

The elements of intimidation of a witness are:

1. That Paul Minick was a witness in this court; and,

2. One of the conspirators knowingly used force or threats against Paul Minick at a time when Paul Minick was a witness; and,

3. The conspirator acted with the intent to influence, intimidate or impede Paul Minick in the case of State v. Rachel Smith.

Smith argues these instructions are erroneous for failure to include the phrase "acting in the discharge of his duty" so as to limit the temporal period that Minick could be considered a witness.

Other courts have addressed the issue of whether a witness must be under the direction of a subpoena in order to qualify as a witness. *United States v. Chandler,* 604 F.2d 972, 974, *reh'g. denied,* 608 F.2d 524 (5th Cir.1979), *cert. dismissed,* 444 U.S. 1104,

100 S.Ct. 1074, 63 L.Ed.2d 317 (1980), apply-ing a federal statute,[1] said in that regard:

> This court has defined a section 1503 witness as one who "knows or is supposed to know material facts, and is expected to testify to them, or to be called on to testify * * *." *Hunt v. United States,* 400 F.2d 306, 307 (5th Cir.1968), *cert. denied,* 393 U.S. 1021, 89 S.Ct. 629, 21 L.Ed.2d 566 (1969); *Odom v. United States,* 116 F.2d 996, 998 (5th Cir.), *rev'd on other grounds,* 313 U.S. 544, 61 S.Ct. 957, 85 L.Ed. 1511 (1941). Other courts, too, have adopted this functional approach to ascertaining whether a person is a "witness" within the meaning of section 1503 [18 U.S.C. § 1503]. *E.g., United States v. Jackson,* 168 U.S.App.D.C. 198, 201, 513 F.2d 456, 459 (D.C.Cir.1975); *United States v. Griffin,* 463 F.2d 177, 179 (10th Cir.1972); *United States v. Grunewald,* 233 F.2d 556, 571 (2d Cir.1956), *rev'd on other grounds,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Berra v. United States,* 221 F.2d 590, 596–97 (8th Cir.1955); *United States v. Perlstein,* 126 F.2d 789 (3d Cir.), *cert. denied,* 316 U.S. 678, 62 S.Ct. 1106, 86 L.Ed. 1752 (1942). Indeed, the statute's very purposes of protecting participants in federal judicial proceedings and preventing interference by corrupt methods with the administration of justice, *Samples v. United States,* 121 F.2d 263, 265 (5th Cir.1941) (construing 18 U.S.C. § 241, a precursor of 18 U.S.C. § 1503), require that the connotation of "witness" be "determined with a view to substance, rather than form." *United States v. Grunewald, supra.* See *United States v. Jackson, supra* (instruct-ing that in determining whether a person is a section 1503 witness the court not lose sight of the statutory purposes, "one of which clearly is the protection of participants in federal judicial proceedings, and thereby the protection of the public interest in the due administration of justice").

Thus, we have held that a person "may be a witness within the protection of this statute though he may not be under formal subpoena." *Odom v. United States, supra* (construing 18 U.S.C. §§ 241 and 242, now 18 U.S.C. § 1503). And we have ruled that an informer who had given information to the government, resulting in the filing of a complaint with a United States Commissioner, and who was expected to testify in future legal proceedings that had not yet been convened when the effort to impede him in the exercise of his duty to testify occurred, was a witness protected by 18 U.S.C. § 1503. *Hunt v. United States, supra.* In the same spirit of statutory construction, this court has not limited the definition of "witness" by the notion, arguably suggested by the language of some cases and urged by appellant Chandler here, that a person who has testified or is expected to testify at a trial can be considered a "witness" only while the case is pending in the trial court and while that court retains control over him as one who can be commanded to appear and give evidence in the case pending before it. [Footnote 4 omitted.] *See Hunt v. United States, supra* at 307–08 (holding person a witness if he "knows or is supposed to know material facts, and is expected to

---

**1.** The federal statute, 18 U.S.C. § 1503 (1948), in the form it existed at that time read:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

testify to them" and finding it immaterial for section 1503 purposes that the legal proceeding in which the putative witness was expected to testify was not active before a court in which he could have testified when an effort was made to deter him from later testifying, but instead was pending between preliminary examination and grand jury stages).

Applying our pragmatic definition of a section 1503 "witness" in light of the protective purpose of the obstruction of justice statute, we find that Mann retained his status as a "witness" while the *Talapoosa Pipeline* case was pending on direct appeal. As the government's chief informant against Chandler in that case, Mann knew material facts. Chandler's appeal of his conviction gave rise to the realistic possibility that the *Talapoosa Pipeline* case would be retried on remand from the circuit court, thereby creating the necessary "present prospect" that Mann's "testimonial potential" would be exploited. [Footnote 5 omitted.] *United States v. Jackson, supra* 168 U.S.App.D.C. at 201, 513 F.2d at 459. His protection fell squarely within the purpose of section 1503, and proof that Chandler had attempted to have Mann killed in order to prevent him from testifying in a pending federal judicial proceeding thus established that he violated 18 U.S.C. § 1503. [Footnote 6 omitted.]

Addressing the question of whether a judicial proceeding was pending for purposes of applying the language of 18 U.S.C. § 1503 that provides "[w]hoever * * * corruptly, or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice * * *" is an offense, the United States Court of Appeals for the Fourth Circuit stated:

The requirement that a proceeding be pending is a practical one. As the Third Circuit has stated in a related contest, "we are required to assess the extent of the relationship, whether in time, causation or logic, between the acts complained of and the progress of some 'administration of

justice.'" *United States v. Walasek,* 527 F.2d 676, 679 n. 12 (3d Cir.1975).

\* \* \* \* \* \*

We need not sift through the nuances of these arguments for insofar as what is sought is a causative link between the conduct charged and an obstruction of justice, Johnson's own appeal provided it. Among the grounds urged in that appeal were several relating to the admissibility of testimony at the trial. \* \* \* Had he prevailed on any of these points, his conviction could have been vacated and the cause remanded to the district court for a new trial. The conduct charged might of course affect the course of any new trial.

This appeal does not present the occasion for us to delineate for the purpose at issue the full duration of a criminal prosecution in the district court. We need only hold that for this purpose a criminal action remains pending in the district court until disposition is made of any direct appeal taken by the defendant assigning error that could result in a new trial.

*United States v. Johnson,* 605 F.2d 729, 730–31 (4th Cir.1979), *cert. denied,* 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980).

The court held the defendant's conduct fit within the purview of the statute when he attempted to induce a principal witness against him to falsely recant his testimony after the jury had rendered an adverse verdict; he had been sentenced; and he had noted his appeal.

■ Smith's argument is that the determination of whether a person is a witness in the discharge of his duty depends upon whether he has been subpoenaed and is still subject to that subpoena. Since that is the thrust of Smith's argument, it makes little difference whether the words "in the discharge of his duty" were or were not included in the elements instruction, although we acknowledge the general desirability of incorporating statutory language in the elements instruction with respect to a criminal offense. The essence of Smith's position is that one cannot be a "witness" unless one is under subpoena and has not been discharged. The persuasive authority cited and quoted above tells us

one can be a "witness" both prior to being subpoenaed and after being discharged from a subpoena. The question is not whether one is under subpoena, but whether one has knowledge of material facts and is expected to be called to testify or testify about them. We hold the functional approach articulated in *Chandler* is appropriate in the construction of our statute, and Minick was a "witness" at the time of the assault and battery.

It is possible to visualize circumstances in which one would be a "witness," but any assault would be unrelated to the discharge of his duty. If, for example, a person who is a "witness" in some judicial proceeding were to be assaulted in an altercation which had no relationship to the judicial proceeding, such as a private quarrel over a property boundary, there would be no attempt to influence, intimidate, or impede the witness in the discharge of his duty. Such are not the facts in this instance, and the relationship between the assault and battery and Minick's status as a "witness * * * in the discharge of his duty" is clear, in time, causation, and logic. The assault and battery occurred on the same day within a few hours of Minick's testimony. Causation is demonstrated by the testimony of MAG who reported Smith claimed, "a guy that had lied in court and got the sister into trouble and convicted her, whatever and they wanted me to beat [him] up." The logical relationship between Minick's status as a witness and the assault and battery also is clear. We hold that, as the trial court instructed, Minick was a "witness" as a matter of law, and the failure to instruct by using the statutory language "in the discharge of his duty" does not constitute reversible error under these circumstances.

■ We part company with the United States Court of Appeals for the Fourth Circuit in *Johnson,* because we think it is useful to delineate, for purposes of this statute, the point in time at which one would cease to be a witness. Certainly, that status could not exist in perpetuity. In our view, the appropriate rule is that a person can be a "witness" during that period in which the case has a possibility for further proceedings in the trial court. In the case of Rachel Smith, further proceedings could have been achieved by virtue of a motion for a new trial, by appeal, or even conceivably by an effort at post-conviction relief under WYO.STAT. §§ 7-14-101 to -108 (1987). In our view, the potential of post-conviction relief does not justify maintaining the status of a "witness" beyond the affirmation of a conviction on direct appeal. Up until that point in finality, however, a person who is a "witness" will remain a "witness," and the provisions of WYO.STAT. § 6-5-305(a) will protect that person.

Sound public policy supports this determination. In *People v. Proctor,* 194 Colo. 172, 570 P.2d 540, 542 (1977), the court dealt with the construction of a similar statute and an assertion that the statute was unconstitutional. It ended the opinion by adopting language of the Supreme Court of the United States, saying:

> We also find that this statute is necessary to ensure the proper functioning of our judicial system.
>
> "A state may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).
>
> Such necessary safeguards are justified restrictions upon the constitutionally protected right of free speech. *Cox v. Louisiana, supra.* Thus we find the statute to be constitutional.

We agree with that policy articulation. The person who is a witness must be free from any chilling effects of force or threats. The chilling effects can occur whether or not one is under subpoena. The chilling effects could be just as effective prior to a subpoena or, in this case, subsequent to release from a subpoena, and the administration of justice would not be free from outside control and influence.

■ Our holding with respect to the instruction defining a "witness" and the elements instruction, in effect, resolves Smith's claim of insufficiency of evidence. His argument that the evidence was not sufficient to establish he committed the crime of conspiracy to intimidate a witness depends upon the

acceptance of his views of the law. He does, however, also contend the evidence was insufficient because this statute requires specific intent. It is apparent there is no articulation of any specific intent in WYO.STAT. § 6-5-305(a). Smith contends nothing occurred to Minick prior to his testimony, and it was only after the verdict was rendered that Minick was assaulted. Smith further contends his intent was retribution rather than any effort to influence Minick's testimony. He appears to agree he conspired, but he denies he conspired to intimidate Minick and argues, for that reason, there was no obstruction of justice.

Smith relies upon *State v. Hall*, 441 So.2d 429 (La.Ct.App.1983), to support the proposition that, when the intent was to accomplish some purpose other than to obstruct the administration of justice such as to cause a witness to lose his job or to punish or get even with a witness, the defendant does not act with the requisite specific intent. Our examination of *Hall* persuades us Smith's reliance is misplaced. The Louisiana statute contains language that is more narrowly structured and includes the "intent to influence his [person being intimidated] conduct in relation to his position, employment, or duty." LA.REV.STAT.ANN. § 14:122 (West 1986). Our statute has much broader language and reaches intimidation or impeding as well as influencing. Our statute does not require the specific intent upon which Smith, in part, hinges his argument.

We are satisfied, given the correct interpretation of the law, the evidence was more than sufficient to sustain his conviction, when measured by our usual test as definitively articulated in *Geiger v. State*, 859 P.2d 665, 669 (Wyo.1993):

> Our standard when reviewing for sufficiency of the evidence is well settled:
>
>> " '[T]his court is to examine all the evidence in the light most favorable to the state to determine if there is sufficient evidence to uphold the verdict.' " *Dangel v. State*, Wyo., 724 P.2d 1145, 1148 (1986), quoting from *Aden v. State*, Wyo., 717 P.2d 326, 327 (1986).
>>
>> "[I]t is not whether the evidence establishes guilt beyond a reasonable doubt

for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in the light most favorable to the State * * *." *Broom v. State*, Wyo., 695 P.2d 640, 642 (1985) * * *.

*Roose v. State*, 759 P.2d 478, 487 (Wyo. 1988). *See also Glazier v. State*, 843 P.2d 1200, 1203 (Wyo.1992).

The record demonstrates the agreement between Smith and Rhoden that Rhoden would assault Minick for the agreed consideration; the actual assault upon Minick by Rhoden; and Minick's status as a witness. The elements of the charged offense were established.

■ The third issue posed by Smith relates to the admissibility of MAG's testimony about Rhoden's statements. The focus is upon those statements made subsequent to the return of Smith and Rhoden from the bus depot where Minick was assaulted. Smith first argues some of the statements merely constituted a solicitation, and that does not connote an agreement for purposes of a conspiracy. He also contends Rhoden's statements were mere bragging and were not made in the course of, or in furtherance of, the conspiracy which he argues ended with the assault upon Minick. The State's position is that Rhoden's statements were not hearsay and were admissible as statements of a co-conspirator during the course of and in furtherance of the conspiracy pursuant to WYO.R.EVID. 801(d)(2)(E).

We have consistently adhered to the concept articulated in W. LAFAVE & A. SCOTT CRIMINAL LAW 460-61 (1972):

> "One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is not the case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any

written statement or even a speaking of words which expressly communicates agreement. * * *

"Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may 'rely on inferences drawn from the course of conduct of the alleged conspirators.'"

*Burke v. State,* 746 P.2d 852, 855 (Wyo.1987). *See Rude v. State,* 851 P.2d 15 (Wyo.1993); *Mondello v. State,* 843 P.2d 1152 (Wyo.1992); *Wehr v. State,* 841 P.2d 104 (Wyo.1992); *Bigelow v. State,* 768 P.2d 558 (Wyo.1989). Given the evidence at Smith's trial, we are satisfied there was ample demonstration of a tacit understanding between Smith and Rhoden.

■ Language in those cases cited above would seem to suggest the conspiracy is concluded when the object of the conspiracy, in this instance the assault upon Minick, has been accomplished. The argument of the State, however, is that this conspiracy continued until the consideration had been paid to Rhoden. That view is supported by federal precedent. *United States v. Doyle,* 771 F.2d 250 (7th Cir.1985); *United States v. Schwanke,* 598 F.2d 575 (10th Cir.1979). Both of these cases stand for the proposition that statements made in connection with payments for assistance in furthering the goals of the conspiracy are made before the last overt act of the conspiracy has taken place. In *Schwanke,* 598 F.2d at 581–82, the United States Court of Appeals said:

Huggins and Collins contend that Schwanke's statements were not admissible under Fed.Rules Evid.Rule 801(d)(2)(E), 28 U.S.C.A. We disagree. Under Rule 801(d)(2)(E) a statement is not hearsay and is therefore admissible if made "by a coconspirator of a party during the course and in furtherance of the conspiracy." At the time Schwanke was picked up he told Keith and Behunin that he needed help, he did not want to go to the hospital, and that he wanted to go to the home of the man who was going to pay him $100 for blowing up the building.

Schwanke's comments that he did not want to go to the hospital and that he wanted to collect $100 for blowing up the building were made during the course of and in furtherance of the conspiracy. The conspiracy was yet in being. It could not have been completed, from Schwanke's view, until he had received the $100. The statements were thus admissible.

■ We hold MAG's testimony about Rhoden's statement was not hearsay under WYO.R.EVID. 801(d)(2)(E), which is adopted from the same rule of the FEDERAL RULES OF EVIDENCE construed in Schwanke. In construing this rule in *Jandro v. State,* 781 P.2d 512, 521 (Wyo.1989), we said:

If the statements which were admitted fit under this rule, they are not hearsay, and any objection to their admission into evidence based upon Rule 802, W.R.E. (which generally excludes hearsay), was properly overruled.

This rule, now so recurrent in criminal prosecutions, had its origin, and finds its justification, in the laws of agency. Indeed, the statements of co-conspirators often were referred to as vicarious admissions. *Bigelow v. State,* 768 P.2d 558 (Wyo.1989). In *Hitchman Coal & Coke Company v. Mitchell,* 245 U.S. 229, 249, 38 S.Ct. 65, [72], 62 L.Ed. 260 (1917), the court explained:

" * * * The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them."

Three elements must be demonstrated before a statement can be admitted as non hearsay under Rule 801(d)(2)(E), W.R.E. There must be evidence of a conspiracy; evidence that the declarant and the defen-

dant both were involved in the conspiracy; and a showing that the proffered statements were made during the course of, and in furtherance of, the conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, reh. denied 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352 (1953); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Bigelow; Burke v. State,* 746 P.2d 852 (Wyo. 1987). The first two requirements insure that the statements were in fact made by a co-conspirator, and the last introduces a measure of relevance and trustworthiness.

The record in this case demonstrates all three of the elements discussed in *Jandro* have been satisfied. There was evidence of the solicitation of MAG by Smith. There was evidence of dialogue between Smith and Rhoden with respect to beating Minick. There was evidence Smith and Rhoden left the bar together prior to the assault upon Minick, and they returned together. The record establishes evidence of a conspiracy and evidence that Smith and Rhoden were involved. We hold Rhoden's statements were made during the course of, and in furtherance of, the conspiracy because it had not been completed until he had been paid the articulated consideration. There was no error in the admission of this evidence.

■ An independent basis is found in the law for the admission of the testimony about Rhoden's statements. Courts have recognized statements made by a co-conspirator immediately after, or close in time to, the accomplishment of a criminal purpose of the conspiracy are admissible in order to characterize the action of the party as *res gestae* of the crime charged. *United States v. Cox,* 449 F.2d 679 (10th Cir.1971), *cert. denied,* 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972); *Moore v. State,* 539 So.2d 416 (Ala. Crim.App.1988); *Durden v. State,* 93 So. 342 (Ala.Ct.App.1922), *cert. denied, Ex parte Durden,* 208 Ala. 697, 93 So. 922 (1922); *Lesieurs v. State,* 170 Ark. 560, 280 S.W. 9 (1926); *State v. Mushrush,* 97 Iowa 444, 66 N.W. 746 (1896); *Gilbert v. Commonwealth,* 228 Ky. 19, 14 S.W.2d 194 (1929); *Phelps v.*

*State,* 15 Tex.App. 45 (1883). The evidence of Rhoden's statements was admissible under this doctrine as well as under the usual rule that it was made in the course of, and in furtherance of, the conspiracy.

■ We finally turn to Smith's contention that the trial court erred in its Conditional Order Permitting Leave to Proceed *in Forma Pauperis* and Order Continuing Appointment of Counsel and Requiring Periodic Payments. The statutory authority for requiring reimbursement for the services of the public defender is set forth in WYO.STAT. § 7–6–106(c) and (d) (1987):

> (c) To the extent that a person receives the services set out in W.S. 7–6–104, and is able to provide some funds toward the costs associated with such services, the presiding court may order the person to reimburse the state for the cost of the services provided. In making such an order, the court shall consider the financial resources of the person and the expenses and services provided in light of the state public defender's standard fee schedule. Where a person is initially provided with counsel pursuant to W.S. 7–6–105(a), but subsequently retains private counsel, the court may order the person to reimburse the state for the services already provided.
>
> (d) If the court orders probation before sentence, suspended sentence or probation, the court shall order the needy person as a condition of sentence or probation to repay the state for expenses and services provided by appointed attorneys pursuant to the state public defender's standard fee schedule.

In presenting this contention, Smith relies upon *Schiefer v. State,* 774 P.2d 133, 136 (Wyo.1989), where we said by way of dictum:

> Although our disposition of this issue also precludes the district court from reserving the right to assess additional attorney fees for an appeal, such issue may likely arise again, and so we address it briefly. The statutes make no provision for assessment of attorney fees by the district court upon conclusion of the appeal. Such assessment cannot be made before or after the effective date of W.S. 7–6–106(d).

Our rule with respect to penal statutes is that they must be strictly construed and cannot be enlarged by implication or extended by inference or construction. *State v. Stern*, 526 P.2d 344, 350 (Wyo.1974). The language of WYO.STAT. § 7–6–106(c) (1987) speaks to reimbursement of the state "for the cost of the services provided." The authority to enter such an order is addressed to the presiding court, which we would have to conclude is the Supreme Court in connection with an appeal. In Wyoming, every defendant in a criminal case is entitled to an initial appeal as a matter of right. *Farbotnik v. State*, 850 P.2d 594 (Wyo.1993). WYO.STAT. § 7–6–104 provides for the representation of a needy person on appeal, but imposing an anticipatory requirement for periodic payments is not consistent with the statutory language. It might well discourage one from taking an appeal in circumstances in which one would be taken absent that condition. We reverse the Conditional Order Permitting Leave to Proceed *in Forma Pauperis* and Order Continuing Appointment of Counsel and Requiring Periodic Payments.

This court, however, is authorized to impose a requirement of reimbursement for the costs of representation on appeal. In this instance, we conclude it is appropriate for the office of the public defender to furnish this court with a statement of expenses and services in light of the public defender's standard fee schedule. Once that report has been furnished, the court will consider whether Smith will be ordered to reimburse the State for the cost of the services provided and will request the district court to make the appropriate determination with respect to the extent to which Smith is able to provide funds for the costs associated with the services of the public defender.

We hold no error occurred with respect to the instructions to the jury and, in light of our usual standards for considering the sufficiency of the evidence, there was sufficient evidence to find Smith guilty of the crime of conspiring to influence, intimidate, or impede a witness in violation of WYO.STAT. § 6–1–303(a) and WYO.STAT. § 6–5–305(a). No error occurred in the admission of the statements of the co-conspirator, and the Judgment and Sentence must be affirmed. The Conditional Order Permitting Leave to Proceed *in Forma Pauperis* and Order Continuing Appointment of Counsel and Requiring Periodic Payments is reversed.

LEHMAN, Justice, dissenting.

I dissent. Smith was charged with conspiring to intimidate a witness in the discharge of that witness' duty.[1] The district court, in effect, instructed the jury that the State was not required to prove beyond a reasonable doubt that the victim of the assault was a witness in the discharge of his duty. The State is required to prove each element of a crime beyond a reasonable doubt. *Mitchell v. State*, 865 P.2d 591, 596 (Wyo.1993); *Wetherelt v. State*, 864 P.2d 449, 451 (Wyo.1993); and *see Blakely v. State*, 474 P.2d 127 (Wyo.1970); *State v. Hickenbottom*, 63 Wyo. 41, 178 P.2d 119 (1947). The jury was required to have found, under proper instructions, that the actions of Smith constituted intimidation of a witness in that witness' discharge of his duties. Unfortunately that is not what the jury was instructed to do.

I agree that Smith's actions were reprehensible and that he was likely guilty of the crime charged. That, however, is not the test we apply in these circumstances on appeal. Smith was entitled by one of the most fundamental of our constitutional rights to have the jury decide his guilt. Here the jury decided his guilt in part, and the other part was directed by the trial court. I have searched in vain for even the most slender thread of authority which might countenance such an occurrence. I can find none. I, therefore, would reverse and remand for further proceedings.

---

**1.** Wyoming Statutes 6–1–303(a) and 6–5–305   (1988).